# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRAYDEN HURD, A MINOR, by** | : | **No. 3:06cv1927** |
| **his parents and natural guardians,** | : | |
| **KATRINA ENGLE and** | : | |
| **BRYAN HURD, and** | : | **(Judge Munley)** |
| **KATRINA ENGLE and** | : | |
| **BRYAN HURD in their own right,** | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS A YAEGER, M.D.;** | : | |
| **BAMBI PETRINIC, M.D.;** | : | |
| **ROBERT PACKER HOSPITAL;** | : | |
| **GUTHRIE CLINIC SAYRE; GUTHRIE** | : | |
| **HEALTH CARE SYSTEM,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the court, in this medical malpractice action, is the defendants' motion to preclude plaintiffs' expert reports under Rule 26 and Rule 37 of the Federal Rules of Civil Procedure, Rule 702 of the Federal Rules of Evidence, and <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). Defendants move to strike nine expert reports and exclude those experts from offering into evidence any testimony, reports, or opinions in subsequent proceedings. Having been fully briefed, this matter is ripe for disposition. For the reasons below, this motion is denied as to all experts.

# I. BACKGROUND

Plaintiff Katrina Engle presented to a physician at defendant Guthrie Clinic Sayre ("Clinic") on March 13, 2006.  She was approximately twenty-eight weeks pregnant at the time.  (Amended Complaint (Doc. 72) at ¶ 13) (hereinafter "Am. Complt.").  She complained of abdominal discomfort, cramping, and feeling "like her fetus's head was pushing down."  Plaintiff Engle was diagnosed with a urinary tract infection and sent home.  (Id.).  Later that day, Plaintiff Engle telephoned the Clinic and spoke to a nurse regarding further cramping and vaginal bleeding, but she was told that these symptoms were consistent with a urinary tract  infection. (Id. at ¶ 14).

That same evening, Plaintiff Engle visited defendant Robert Packer Hospital ("Hospital") complaining of similar symptoms during an evaluation by defendant Dr. Bambi Petrinic, M.D. (Id. at ¶ 15-18).   By telephone, Defendant Petrinic consulted the attending physician on call, Defendant Dr. Thomas A. Yaeger, M.D. (Id. at ¶ 20).  Defendant Yaeger relied on Defendant Petrinic's report at the time and did not personally examine Plaintiff Engle.  (Id. at ¶¶ 21-22).  Plaintiff Engle was subsequently discharged from the Hospital at 7:30 PM. (Id. at ¶ 23).

At approximately 12:30 AM on March 14, 2006, Plaintiff Engle presented

to Arnot Ogden Medical Center in Elmira, New York, again with complaints of sharp abdominal pain and vaginal bleeding. (Id. at ¶ 24). Upon examination, Plaintiff Engle's cervix was found to be fully dilated. Shortly thereafter, Plaintiff Engle went into early labor. (Id.). Minor-Plaintiff Hurd was born early that morning with a host of physical and mental conditions related to his premature birth, including several heart and lung ailments and various developmental deficits. (Id. at ¶¶ 12, 26).

Plaintiffs allege medical malpractice against the defendants for failure of to meet the standard of care in treating Plaintiff Engle and Minor-Plaintiff Hurd. According to the plaintiffs, the defendants specifically failed to recognize the risk factors and symptoms of Plaintiff Engle's pre-term labor and dispense tocolytics, or labor-delaying drugs,[1] so that Minor-Plaintiff Hurd could develop further in utero through the administration of steroid treatments. (Plaintiffs' Memorandum in Opposition to Defendant's Motion to Preclude Plaintiffs' Expert Reports and Opinions (Doc. 142) at 6-10) (hereinafter "Memo. in Opposition").

This case was commenced on September 28, 2006 by way of

---

[1] A "tocolytic" is a "pharmacologic agent used to arrest uterine contractions; often used in an attempt to arrest premature labor contractions[.]" Stedman's Medical Dictionary, p. 1994 (28th ed. 2006).

Complaint.  (Doc. 1).  On March 24, 2008, Plaintiffs filed an Amended

Complaint and added a new party, Defendant Petrinic.  (Doc. 72).

Defendants now move to preclude the plaintiffs' use of nine expert opinions

and testimony, in whole or in part, pursuant to Rule 26 and Rule 37 of the

Federal Rules of Civil Procedure, Rule 702 of the Federal Rules of Evidence,

and Daubert. (Defendants' Motion to Preclude Plaintiffs' Expert Reports and

Opinions (Doc. 122)).  These experts include: (1) Dr. Albert George Thomas,

Jr., M.D, M.S., OB-GYN; (2) Dr. Harlan Giles, M.D., OB-GYN; (3) Dr. Marcus

Hermansen M.D., neonatologist; (4) Dr. Steven Kugler, M.D., pediatric

neurologist; (5) Dr. Thomas Rugino, M.D., neurodevelopmental physician; (6)

David L. Hopkins, ASA, actuary; (7) B.A. McGettigan, R.N., life-care planner;

(8) Dr. Michael Steinhardt, Psy. D, psychologist; and (9) Brenda Bugbee,

R.N., neonatal pain expert.  (Defendant's Memorandum of Law in Support of

Their Motion to Preclude Plaintiffs' Expert Reports and Opinions (Doc. 123) at

5) (hereinafter "Memo. in Support").

## II. JURISDICTION

Minor-Plaintiff Hurd, Plaintiff Engle, and Plaintiff Bryan Hurd are citizens

of New York. (Am. Cmplt. at ¶ 1-3).  Defendants Yaeger and Petrinic are

citizens of Pennsylvania.  (Id. at ¶ ¶ 4-5).  Defendants Robert Packer Hospital,

4

Guthrie Clinic Sayre, and Guthrie Health Care System are corporations or legal entities organized and existing under the laws of Pennsylvania. (Id. at 6-8). The amount in controversy exceeds $75,000. (Id. at ¶ 10).  This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  The substantive law of Pennsylvania shall apply to the case.   Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

## III. STANDARD OF REVIEW

The admissibility of expert testimony is a question of law governed by Rule 702 of the Federal Rules of Evidence ("Rule 702"), Daubert, and its progeny.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

Rule 702 has largely evolved from Daubert and later Supreme Court cases that have clarified or extended its holding.  As a "gatekeeper," the trial judge "must ensure that any and all scientific testimony or evidence admitted

is not only relevant, but reliable." Daubert, 509 U.S. at 589.   The "trial judge's general 'gatekeeping' obligation – applies...also to testimony based on 'technical' and other 'specialized' knowledge." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).

The Third Circuit has interpreted Rule 702, Daubert, and its progeny as imposing three restrictions on the admission of expert testimony: qualifications, reliability, and fit.  In re Paoli R.R. Yard PCB Litig., 35 F. 3d 717, 741-43 (3d Cir. 1994) cert. denied, 513 U.S. 1190 (1995) ("Paoli II"); Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).  The party that wishes to introduce expert testimony bears the burden of demonstrating that the testimony is admissible by a preponderance of the evidence.  Daubert, 509 U.S. at 593 (citing Bourjaily v. United States, 483 U.S. 171, 175-76 (1987); In re TMI Litig., 193 F.3d 613, 663 (3d Cir.1999).

First, an expert must be qualified.  A qualified expert is required to have specialized knowledge in her area of testimony, which may be based in practical experience as well as academic training and credentials. Elcock, 233 F. 3d at 741.  The specialized knowledge requirement has been interpreted liberally in the substantive as well as the formal qualification of experts;  "'at a minimum, a proffered expert witness...must possess skill or knowledge

greater than the average layman...."' <u>Id.</u> (quoting <u>Waldorf v. Shuta</u>, 142 F.3d 601, 625 (3d Cir.1998)).

Second, an expert must be reliable.   While there is not a definitive checklist of factors that courts must follow, the Supreme Court has offered several grounds to be considered in determining the reliability of proposed expert testimony.  <u>Daubert</u>, 509 U.S. at 592-594.   The Third Circuit has incorporated these points into a more comprehensive, but non-exhaustive, set of factors that a District Court must weigh:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

<u>Paoli II</u>, 35 F. 3d at 742 n. 8.

However, these factors are "simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted." <u>Heller v. Shaw Industries, Inc.</u>, 167 F.3d 146, 152 (3d Cir.1999). Related to these factors, "a trial court may consider one or more. . . when

doing so will help determine that testimony's reliability.  But . . . the test of reliability is 'flexible,' and the Daubert list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  Kumho Tire Co., Ltd., 526 U.S. at 141.   "[R]elevant reliability concerns may focus upon personal knowledge or experience" rather than "scientific foundations."  Id. at 150.

An expert is deemed reliable if the his or her opinion is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." Paoli II, 35 F. 3d at 742 (quoting Daubert, 509 U.S. at 590); In re TMI Litig., 193 F.3d at 664 (3d Cir. 1999).  The focus is not upon the expert's conclusions, but rather upon his or her methodology; the issue is whether the evidence should be excluded because potential flaws are large enough that the expert lacks good grounds for his or her conclusion.  Paoli II, 35 F.3d at 746.  Subsequently, an "expert's testimony must be accompanied by a sufficient factual foundation before it can be submitted to the jury." Elcock, 233 F. 3d at 754 (3d Cir. 2000) (citing Gumbs v. International Harvester, Inc., 718 F.2d 88, 93 (3d Cir.1983).

Third, expert testimony must "fit" the subject matter at issue.  Expert testimony fits the subject matter if it assists the trier of fact in understanding

the evidence or to determine a fact in issue. Daubert, 509 U.S. at 591;

Schneider ex rel Est. of Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003).

"Admissibility thus depends in part upon 'the proffered connection between

the scientific research or test result to be presented and particular disputed

factual issues in the case.'" Oddi v. Ford Motor Co. 234 F.3d 136, 145 (3d Cir.

2000) (quoting Paoli II 35 F.3d at 743). However, plaintiffs do not have to

prove their case twice. They "do not have to demonstrate to the judge by a

preponderance of the evidence that the assessments of their experts are

correct, they only have to demonstrate by a preponderance of evidence that

their opinions are reliable."  Paoli II, 35 F.3d at 744.

"The analysis of the conclusions themselves is for the trier of fact when

the expert is subjected to cross-examination." Kannankeril v. Terminix

International Inc., 128 F.3d 802, 806 (3d Cir. 1997).   However, an expert who

proffers an opinion based on factual assumptions not present in the case

"cannot be said to 'assist the trier of fact,' as [R]ule 702 requires." Elcock, 233

F.3d at 756 n. 13. "This type of an opinion misleads the fact-finder and

arguably does not comply with the 'fit requirement' of [Rule 702]." Id. (internal

citations omitted).

While this court may admit a somewhat broader range of scientific testimony than was allowed pre-Daubert,  "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* [2] of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Electric v. Joiner, 522 U.S. 136, 142, 146 (1997) ("Joiner").   But ultimately, the trial court is granted leeway when it determines how to evaluate expert testimony before trial, just as it enjoys in an ultimate ruling on the case.  Id. at 143 (appellate courts are to apply "abuse of discretion" standard when reviewing district court's reliability determination).

**IV. DISCUSSION**

**A. The opinions of plaintiffs' OB-GYN experts Dr. Albert George Thomas, M.D. and Dr. Harlan Giles**

Defendants first move to preclude plaintiffs' "standard of care" experts, Dr. Albert George Thomas and Dr. Harlan Giles.  In their argument to preclude these experts, the defendants target reports and testimony related to the effectiveness of tocolytic drugs in delaying labor.  Dr. Thomas and Dr.

---

[2] *Ispe dixit* is defined as: "Something asserted but not proved," from Latin, "he himself said it." Black's Law Dictionary (8th ed. 2004).

Giles both opine that tocolytics are effective to delay labor beyond two days. (Memo. in Support at 16). Defendant experts assert that the administration of tocolytic drugs can only delay labor one to two days, if at all. (Id.) Moreover, certain defense experts have had their opinions on tocology published, while the plaintiff experts in question cannot cite to supporting medical literature. Because Dr. Thomas avoided assigning a precise limit to the time that Plaintiff Engle's pregnancy could have been extended, and did not reference a specific study to support his opinion, the defendants question his reliability, calling his testimony speculative, *ipse dixit*, and inadmissible. The defendants also contend that the plaintiffs' rebuttal expert on the same issue, Dr. Giles, did not cite medical studies, report his anecdotal cases to his peers, or initiate a study to support his opinion. Therefore, the defendants argue, Dr. Giles's testimony on tocology is unreliable as well. We disagree.

Liberal admissibility extends particularly to medical experts under the law as applied in the Third Circuit, even to those who make differential diagnoses or those who rely on information that is under-scrutinized by other professionals or unpublished in medical journals. As stated in Heller:

> Given the liberal thrust of the Federal Rules of
> Evidence, the flexible nature of the Daubert inquiry,
> and the proper roles of the judge and the jury in
> evaluating the ultimate credibility of an expert's

> opinion, we do not believe that a medical expert must
> always cite published studies on general causation in
> order to reliably conclude that a particular object
> caused a particular illness.

167 F.3d at 155.

Moreover, the <u>Heller</u> court recognized that "physicians do not wait for conclusive, or even published and peer-reviewed, studies to make diagnoses to a reasonable degree of medical certainty. . . [E]xperience with hundreds of patients, discussions with peers . . . and thorough examinations are the trade and should suffice. . . The Federal Rules of Evidence recognize as much." <u>Id.</u> Later decisions in the Third Circuit acknowledged that, "where there are other factors that demonstrate the reliability of the expert's methodology, an expert opinion should not be excluded simply because there is no literature on point." <u>Schneider</u>, 320 F.3d at 406.

The plaintiffs have shown that the reports and testimony of Dr. Thomas meet the three requirements of Rule 702, <u>Daubert</u>, and its progeny - - that is qualifications, reliability and fit. Related to qualifications, which are not challenged, Dr. Thomas opines based on personal observations from twenty-five (25) years of clinical experience, management of patients similar to Plaintiff Engle, and administration of tocolytics some 100-500 times. (Doc. 142-6, Pl. Ex. C, Thomas Deposition at 67-70, 149, 173).

The qualifications of Dr. Thomas also speak to his reliability. Dr. Thomas has experience in extending pregnancy with tocolytics by as long as two to four weeks. (Id. 149-150). While Dr. Thomas may not cite specific studies that support his opinion, he puts forth testimony that he made a general review of related literature within the past five years, and consulted data available on the Cochrane database (an online collaboration of clinical study meta-analyses). (Id. at 173-74). Although the opinion is proffered without specific reference to available medical literature, we conclude that Dr. Thomas's quarter-century of clinical experience renders his testimony reliable and establishes that his testimony is based on "good grounds." See Schneider, 320 F.3d at 406.

Indeed a review of some of the tocolytic studies presented by the defendants indicate that labor may be delayed by these drugs for more than 48 hours. Defendants reference articles written in part by one of their corresponding experts, Dr. Goldenberg, that explore the efficacy of tocolytics. "[I]f a benefit is defined as a reduction in preterm delivery or even a delay in delivery for more than a week, the effect of tocolytic therapy appears to be minimal." (Doc. 123-2, Def. Ex. J, Robert I. Goldenberg, et al., *Prevention of Preterm Birth*, 335 NEW ENG. J. MED. 313, 316 (1998)). "[M]eta-analyses

suggest that [tocolytics] can delay delivery by 2-7 days with optimum risk-benefit ratio." (Id., Jay D. Iams, et al., *Primary, Secondary, and Tertiary Interventions to Reduce the Morbidality and Mortality of Preterm Birth*, 371 THE LANCET 164, 171 (2008)).

Defendants counter that the specific type of tocolytic drugs cited in the latter article were not widely used or were unavailable at the Hospital during Plaintiff Engle's pregnancy. The availability of these tocolytics at the Defendant Hospital is not in question today, however. It is clear that sorting through these nuanced opinions about the efficacy of labor-delaying drugs would be best left to the trier of fact. When such gradations of opinion are present in the field, the clinical experience of Dr. Thomas, among other factors, overcomes a lack of specific citation to medical scholarship to establish reliability.

Regarding the fit of his testimony, Dr. Thomas's report would assist a trier of fact in understanding the evidence or in determining a fact in issue. Dr. Thomas does not proceed based on factual assumptions; he opines based on extensive clinical experience in his specialty. Should this case proceed to trial, the defendants will have ample opportunity to present their own expert opinions and cross-examine Dr. Thomas in an attempt to dispute

his view and promote those of its experts before a jury.   As such, Dr.

Thomas's expert opinion will not be precluded for a lack of qualifications,

reliability, or fit.

For similar reasons, the plaintiffs also have shown that the expert report

of Dr. Giles satisfies Rule 702, <u>Daubert</u>, and pertinent case law.  The expert

rebuttal report of Dr. Giles opines about longer pregnancy extensions through

tocolytic drugs in contrast with the published defendant experts.  Although Dr.

Giles concurs with the defendant experts that tocolytics generally can prolong

pregnancy one to two days, he further states that he "personally observed in

practice patients whose pregnancies have been successfully extended far

longer with these same measures – sometimes four weeks or more . . ." (Doc.

142-7, Pl. Ex. D, Giles Report at unnumbered p. 6).[3]

---

[3]Defendants particularly seek to cast doubt upon Dr. Giles by highlighting other factors that may make him appear unreliable, referencing an instance where one of Dr. Giles's reports was precluded by a <u>Daubert</u> motion.  (<u>Id.</u> at 20) (<u>see</u> <u>Richmond Med. Ctr. for Women v. Herring</u>, 527 F.3d 128, 134 n. 1 (4th Cir. 2008) (excluding expert testimony related to a particular method of administering a dilation and evacuation abortion that Dr. Giles could not substantiate with published safety or effectiveness studies nor could recall himself or other doctors using)).   A determination by another district court under the facts of that case, however, has no bearing on the qualifications, reliability, or fit of Dr. Giles's report and testimony in the instant case.  We believe that Dr. Giles did not have the clinical experience in those particular circumstances to add credence to his specific testimony in that case.

As with Dr. Thomas, the defendants challenge Dr. Giles's report as speculation and *ipse dixit* because he cannot produce any published evidence or other direct testimony that would support his opinion. As noted earlier, courts recognize that an expert opinion not explicitly supported by published medical scholarship can still be reliable and admissible when the expert has extensive clinical experience. See Schneider, 320 F.3d at 406; Heller, 167 F. 3d at 155. Instead of tested, tried, and published, medical studies Dr. Giles offers a reliable opinion based on decades of practice in obstetrics and gynecology. Dr. Giles has thirty years of clinical practice and dealing with high risk and pre-term labors. (Doc. 142-8, Giles Deposition at 23, 27). This experience speaks to his qualifications and reliability, as does his administration of tocolytics some 400-500 times to patients similar to Plaintiff Engle. (Id. at 147-48). Related to fit, the report and testimony of Dr. Giles may assist a trier of fact in understanding the standard of care and the efficacy of tocolytic drugs. The defendants will have the opportunity to scrutinize Dr. Giles's particular opinion before a jury and offer the contrary opinions of its experts on the standard of care and tocolytics. For the above reasons, Dr. Giles's expert opinion will also not be precluded for a lack of qualifications, reliability, or fit.

**B. The opinion of actuary David L. Hopkins, ASA**

Defendants seek to preclude the report of actuary David L. Hopkins, ASA, arguing that his calculations: rely on erroneous assumptions; are unsupported by the reports from other experts; and provide for too broad a range of lifetime care estimates. After a careful review, we will deny this motion.

The law provides that: "'Although mathematical exactness is not required, [expert] testimony of post-injury earning capacity must be based upon the proper factual foundation.'" Elcock, 233 F. 3d at 754 (quoting Benjamin v. Peter's Farm Condo. Owners Ass'n., 820 F.2d 640, 643 (3d Cir.1987)). Moreover, "a lost future earnings expert who renders an opinion about a plaintiff's future economic harm based on economic assumptions not present in the plaintiff's case cannot be said to 'assist the trier of fact,' as Rule 702 requires. This type of an opinion misleads the fact-finder and arguably does not comply with the 'fit' requirement of that Rule." Id. at 756, n 13.

In Elcock, the Third Circuit found that an expert's economic damages model relied on several empirical assumptions unsupported by the record. The expert in question provided a calculation based on total wage loss under circumstances that other plaintiff experts foresaw as somewhere between fifty

17

percent and seventy-five percent disability.  Since "a jury is likely to adopt the gross figure advanced by a witness that has been presented as an expert," the court found that the district court had abused its discretion in admitting the testimony.  Id. at 756.

Citing Elcock, the defendants challenge the fit of Hopkins's report as it relates to the reports of other plaintiff experts.   In his calculations, Mr. Hopkins specifically relies on the work of B.A. McGettigan, a registered nurse and the plaintiffs' life-care planning expert.  (Doc. 123-3, Def. Ex. S, Hopkins Deposition at 78).

Defendants raise three points of contention regarding Hopkins's calculations.  First defendants argue that Hopkins's calculations are based on a total loss of earning capacity, which neither McGettigan nor any other damage experts contemplated.   Second, Hopkins's health care cost calculations account for lifelong group home care, or lifelong in-home companion care, neither of which were in McGettigan's report.  McGettigan's report only contemplates "facilitator care," defined as visits by an unskilled nurse.  Third, Hopkins also provides a wide range of medical care costs extended over Brayden Hurd's lifetime, from $2.7 million (lifelong facilitator

care at 1.5% medical care inflation per year) to $128.9 million (lifelong live-in companion care at 6.5% medical care inflation per year).

After a careful review we find that Hopkins's report and testimony meets the factual foundational requirements put forth in Elcock because it is based on a sufficient factual foundation and will assist the trier of fact in determining the proper amount of damages.  Any calculation by an actuary that measures the life impact of a brain injury to an infant may be attacked as intrinsically speculative.  Indeed, this case presents a more complicated scenario than Elcock.  In that case, the plaintiff was fifty-one years old when she was involved in a slip-and-fall injury that caused lower back pain.  Here, the injury alleged is to the minor-plaintiff's young, developing brain, an organ not as easily understood, even by experts.   (Memo in Opposition at 36).  Dr. Rugino, one of plaintiffs' many neurological experts, states that Minor-Plaintiff Hurd will require ongoing re-evaluation since the increased demands and expectations of maturity might effect the extent of the his deficits and delays. (Doc. 140-4, Pl. Ex. L, Rugino Deposition at 156).

Under Pennsylvania law, "where there is evidence that a plaintiff has suffered disabling permanent injury, it is a jury question as to whether such injury will 'shorten' his 'economic horizon' and thereby result in a future loss of

earning power." <u>Frankel v. Todd</u>, 393 F.2d 435, 438 (3d. Cir 1968) <u>cert. denied</u> 393 U.S. 855 (1968) (summarizing several Pennsylvania Supreme Court cases that formulated this standard). "'It is not the status of the immediate present which determines capacity for remunerati[on]. . . Where permanent injury is involved, the whole span of life must be considered.'" <u>Id.</u> at 440 (quoting <u>Bochar v. J. B. Martin Motors, Inc.</u>, 97 A.2d 813, 815 (Pa. 1953); <u>see also</u> <u>Janson v. Hughes</u>, 455 A.2d 670, 671 (1982).

Because the full effects and the precise long-range costs of Minor-Plaintiff Hurd's injury are difficult to project, Hopkins's calculations will assist a trier of fact in placing a monetary value on the lifelong injuries of the minor-plaintiff. Although a jury might adopt the gross figure advanced by an expert, minor-plaintiff Hurd may not need the specific level of care contemplated in Hopkins' higher-end calculations. That, again, is an issue for the trier of fact, rather than a reason to keep the evidence from the jury. In other words, the mere presence of these calculations is not enough to make Hopkins' report unfit for further proceedings. Accordingly, we will not preclude Hopkins' report.

**C. The opinion of clinical neuropsychologist Dr. Michael Steinhardt, Psy. D.**

Next, the defendants challenge Dr. Michael Steinhardt, Psy.D., plaintiffs' neuropsychology expert. Dr. Steinhardt is a rebuttal expert, and he conducted an examination known as the Vineland Adaptive Behavior Scales, Second Edition ("Vineland-II") in a telephone interview with Plaintiff Engle. (See Doc. 123-2, Def. Ex. T, Steinhardt Report). The Vineland II assesses adaptive functioning, defined as "an individual's typical performance of the day-to-day activities that are required for personal and social sufficiency." (Id.) "These scales assess what a child actually does, rather than what he or he [sic] is able to do." (Id.) It also provides a composite score that summarizes an individual's performance across four domains: communication, daily living skills, socialization, and motor skills. (Id.) Defendants contend that Steinhardt deviated from his personal clinical standards in conducting the standardized test via telephone. They now challenge the reliability and fit of Steinhardt's report because he tested Plaintiff Engle in a manner outside his usual approach.

In challenging Steinhardt's reliability, defendants rely on United States v. Williams, No. 05-CR-443, 2007 WL 3118306 (M.D. Pa. Oct. 19, 2007). Williams involved the preclusion of part of a medical expert's testimony after she diagnosed various physical ailments and mental health conditions in a

series of one-hour conversations with women allegedly involved in a prostitution conspiracy.  Id. at *5.  By analogy, defendants argue that Dr. Steinhardt's testimony should be precluded because his methodology in administering a standardized test was atypical and therefore, unreliable and unfit.  Plaintiffs counter that no evidence has been presented that suggests the Vineland-II is unreliable when conducted via telephone.  Moreover, plaintiffs contend that Steinhardt never testified that the Vineland-II must always be administered in person, but that he "like[s] to be able to see the child and work with the child." (Doc. 123-3, Def. Ex. U, Steinhardt Deposition at  13). On the other hand, Dr. Steinhardt testified that he would have administered other formal tests and made some informal observations.  (Id.). Although Steinhardt himself evidently felt satisfied with a telephone interview to assess adaptive functioning in this case.

Because the Vineland II is a questionnaire-based standardized test to scale adaptive behavior and Dr. Steinhardt's report appears to be a discussion and interpretation of Minor-Plaintiff Hurd's Vineland-II test score, we find Williams to be unpersuasive.  In conjunction with the test, Dr. Steinhardt was able to interview Plaintiff Engle to his satisfaction, while also reviewing some of Minor-Plaintiff Hurd's medical records. (See Doc. 123-2,

Def. Ex. T, Steinhardt Report).  Importantly, the doctor in <u>Williams</u> did not

consult with anyone who had knowledge of her patients' medical conditions or

review any of their medical histories.  2007 WL 3118306 at *5.  As a result,

the plaintiffs have satisfied their burden in establishing the reliability of Dr.

Steinhardt's report and testimony.  Moreover, with respect to fit, this court

finds that Dr. Steinhardt's administration of a standardized test is reliable

enough that it would assist a trier of fact in determining the level of the minor-

plaintiff's adaptive behavior .  Accordingly, we will not preclude Dr. Steinhardt.

**D. The opinion of Brenda Bugbee, R.N. related to neonatal pain and suffering in Minor-Plaintiff Hurd**

Defendants contest Brenda Bugbee R.N.'s expert report that Brayden's

experience of pain will have lasting effects throughout his life.   Plaintiffs

conceded that Bugbee has no opinion in that regard and will offer no such

opinion at trial.  (Doc. 142, Pl. Memorandum at 34).  Because Bugbee will not

testify as to these issues, the defendants' motion is moot.

**E. The opinions of Ms. Bugbee, Ms. McGettigan, Dr. Hermansen, Dr. Rugino, and Dr. Kugler related to Minor-Plaintiff Hurd being born at full term**

23

The defendants also argue that Bugbee and the following experts: Dr. Marcus C. Hermansen, M.D. (neonatologist), B.A. McGettigan, RN (life-care planning expert), Dr. Thomas Rugino, M.D. (neurologist), and Dr. Stephen Kugler, M.D. (neurologist) proceed in their damage reports under the assumption that Minor-Plaintiff Hurd would have been carried to full term (37 or 38 weeks of gestation) had Plaintiff Engle been administered tocolytic drugs.  Therefore, according to the plaintiffs, these five reports should be precluded as not fitting the facts of the case since defense experts assert that tocolytic drugs can only extend pregnancy by two days, if at all.  Moreover, the defendants argue that these specific damage reports will mislead or confuse the trier of fact because they do not calculate what Minor-Plaintiff Hurd's outcome would have been had he been born two days later through the use of tocolytics.

Plaintiffs note that their damage experts do not claim that the minor-plaintiff would have been born at full term.  (Doc. 142, Pl. Memorandum at 28-29).  Moreover, plaintiffs contend that Minor-Plaintiff Hurd would not have had to go to full term to avoid injury, asserting that their theories of causation and damages still exist even in an alternate situation where Ms. Engle's pregnancy was extended, even for one or two days.  (Id.).

Counsel on both sides isolate key points in deposition testimony to argue their positions. The arguments raised by the defendants do nothing to persuade this court that the five experts in question have made critical, erroneous assumptions that would mislead a trier of fact. The plaintiffs have met their burden by showing that the comparison of Minor-Plaintiff Hurd, a premature child, to an uninjured child is the real goal of their expert reports, not a comparison of preterm and full-term children. The points of contention related to the differences between the words preterm and premature, and the comparisons or measurements made by the plaintiffs' damage experts are some of the items that the defendants will have to raise before the trier of fact. We find that the expert reports of Ms. Bugbee, Ms. McGettigan, Dr. Hermansen, Dr. Rugino, and Dr. Kugler meet the fit requirements of Rule 702, Daubert, and other pertinent case law. As such, these five experts will not be precluded.

**CONCLUSION**

For the above reasons, all nine plaintiffs' experts challenged by the defendants in this motion to preclude meet the requirements of federal law for the admission of expert testimony. We will therefore deny defendants' motion. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRAYDEN HURD, A MINOR, by** | : | No. 3:06cv1927 |
| **his parents and natural guardians,** | : | |
| **KATRINA ENGLE and** | : | |
| **BRYAN HURD, and** | : | **(Judge Munley)** |
| **KATRINA ENGLE and** | : | |
| **BRYAN HURD in their own right,** | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS A YAEGER, M.D.;** | : | |
| **BAMBI PETRINIC, M.D.;** | : | |
| **ROBERT PACKER HOSPITAL;** | : | |
| **GUTHRIE CLINIC SAYRE; GUTHRIE** | : | |
| **HEALTH CARE SYSTEM** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 13th  day of August 2009, Defendant's Motion to

Preclude Plaintiff's Expert Reports and Opinions under Rule 702 and <u>Daubert</u>

(Doc. 122) is hereby **DENIED**.

**BY THE COURT:**


<u>s/ James M. Munley</u>
**JUDGE JAMES M. MUNLEY**
**United States District Court**